May it please the Court. Good afternoon, Your Honors. I'm William Weinstein on behalf of Plaintiff Appellant Kenneth Shroyer. At the beginning, I'd like to request two minutes of rebuttal time. All right. Thank you, Your Honor. The time you have is your total time, though. That's right, Your Honor. Understood. Your Honor, I thought what we would – or, Your Honors, I thought what we would start with is the question of federal preemption, because the federal preemption issue is one that theoretically would dispose of all the claims without regard to their merits. We don't think it's a close case in this case. In reWireless, an opinion of the FCC on the issue of preemption specifically says that claims like breaches of contract, deceptive practice claims, false advertising claims are not preempted by the FCA. What contract term was violated in your pleading? I mean, what did you plead as? Well, Your Honor, we didn't specifically plead the two contract terms, but they are in the record. Cingular put the contract into the record, and there are really only two terms, and they're substantially the same for every reWireless company. Well, that implicates the leave to amend issue. It does. It does, although it is in the record, and I believe that if there's no dispute as to the terms of the contract, that the court can take judicial notice or refer to the record. It's not factual in that respect, because we're relying on the contract. They're relying. And what did the contract say that they didn't perform on? I'm sorry, Your Honor. What did the contract say that they breached? Yes. What promise did they make? Well, they made two terms, Your Honor. First of all, that service rates and other charges and conditions of service will be per the sales information. So what they're doing – What? Service rates and other charges and conditions of service will be per the sales information that you're provided in connection with your agreement. The second term – What about the rates? Correct. Your rates and your other charges. So your argument is that the rates wouldn't change, that whatever rate you had under the old owner you would have under the new owner. That's correct, Your Honor, that you were entitled to continue your original contract with AT&T under the existing rates, that you shouldn't have to change your contract to less favorable rates in order to – and here's the second term of the contract, Judge Canvey. Service is normally available to your device when it is within the operating range of our system. This isn't a situation where there was problems with the service before the merger and before this immediate change. What happened was immediately after the merger, everything got degraded. People couldn't make calls. There were lost times, and this is within the range of normal service. Day one before the merger, service is fine. Day one after the merger, service is bad. But, counsel, if I understand your argument, your argument is even though these causes of action were not pled in the complaint, the operative complaint, that you would be able to amend the complaint to allege these have given the opportunity. We would, Your Honor. We would definitely – we do believe that we're entitled to amend under MANSERIC. But let me just qualify my answer to your question, and that is this. We did plead a breach of contract claim. We did plead that the plaintiff was entitled to receive his service for prescribed rates, for prescribed rate, and that he was forced to move over to the new singular contract under less favorable rates in order to maintain the service that he had had before. But if I boil your breach of contract case down to its reality, isn't your real problem, you claim that the technical aspects of radio service delivery in a network integration should – that those have somehow diminished. Your Honor, I don't know what the technical services are. Well, as I understand it, your client says that his service diminished, and that it diminished when we had all of this network integration that happened. So it seems to me that what he's really claiming is that the technical aspects of the radio service delivery, which is what it is that he's getting his delivery from, diminished during this network integration. That's what he's saying, isn't it? Your Honor, what he's saying is that he had service the day before the merger and that he was contractually – let me finish. He was contractually entitled to have that service. Well, I understand, and what we're really saying then is we had a network integration here, and the technical aspects of what they are doing during this integration diminished his service. We are not alleging one thing or the other about the technical integration, Your Honor. We don't really care why it happened. It's certainly not for the purpose of 12b-6. We think that this case is directly the same as INRI Wireless, and here's what happened in INRI Wireless where the FCC held that it wasn't preempted. In INRI Wireless, what was advertised was a seamless calling area. That representation of the seamless calling area was advertised and was used to induce individuals to come into that particular provider's services, and then as it turns out, there wasn't a seamless calling area. And what the FCC said, if you represent that you're going to have a seamless calling area and you don't have a seamless calling area, you may have a breach of contract, you may have a false advertising claim or a deceptive practice claim. You're not challenging the technical aspects of it. You're challenging the terms of the contract and the ability to comply with it. But the problem comes that this comes in a little bit different situation than that. The opposition went to the FCC. They entered into negotiation. They did what they had to do to put the service, the rates, the integration plan together. It was all approved by the FCC. And now what your client is saying is that this merger, this, if you will, network integration that you want to put together somehow diminishes my radio services delivery. That's what he's really saying. And why is that something that I can determine as a judge when we really have the FCC who had all that in front of them determining what they had to do, and now you're just complaining that it didn't do what you wanted it to do? Your Honor, we don't care about the merger. All we care about the merger for is the fact that it diminished or degraded their service. What the FCC says is, and I believe consistent with our complaint, is that a carrier may charge whatever price and provide whatever level of service so long as the wireless carrier does not misrepresent either the price or the quality of service. And that's what we are challenging here is only the contractual obligation to provide a prescribed quality of service under the contract. And again, this is a contract term. It says service is normally available to your device when it is within the operating range of our system. And the day before the merger, it was normally available to the device. And the day after the merger, it was not normally available to the device. Now, if that's the cause of the merger, that's the reason that they're breaching the contract. But we're not challenging the right to merge. They can do what they want. They can set up whatever systems they want. But they are obligated to continue to comply with the existing contracts of these AT&T customers. And the day after the merger, they stop complying with their existing contracts. What they said was, oh, we can sell you a chip that will restore the service that you had before. There was nothing in the contract that gave them the right to sell them a chip to restore their prior service. Now, I understand that there's a distinction between degraded service and improvements in service. We understand that. We're not alleging anything about improvements in service. We're alleging only a problem with the degrading of services. Now, what the technical aspects of it, again, I don't know what the technical aspects of it are. Maybe they stopped supporting their AT&T towers. I don't know. But with respect to the fact that you well know where I'm going, my real worry here is that we have Bastion. And Bastion says right in it, their complaint, well, they should have had more AT&T towers. And there's no question that the Seventh Circuit said that's not something the district court should deal with. Now, I look at this case, and I'm saying to myself, well, we had an FCC-approved merger. They looked at the service, the rates, the plan. And really what we're saying is what I'm getting since the merger is less than what I'm getting before. It's just that the people who alleged it are a little smarter than those people in Bastion. They don't say you needed more towers. But the bottom line is the problem is the same. We're talking about whether the technical aspects of that delivery, given this network integration, which would preempt the claim. And then with all due respect, Your Honor, and you know more about it than I know, because in the Rule 12b-6 motion I have no idea why this occurred this way. And with all due respect, I don't know that any member of the panel really knows why this happened this way. If it was a problem with integration, it may have been. If it wasn't a problem with integration, if it was a problem with an affirmative act of defendants, in order to try and move these customers over to less favorable singular platform, the less favorable, maybe they stopped servicing AT&T altogether. It doesn't make sense. But let me also point out that even in the merger order, and again, we're not complaining about the fact that there was a merger. The problem here is that what singular said was we can restore your service. All you have to do is buy a new chip. All you have to do is move over to singular. That's not a technical aspect. That's something where what they're doing is imposing a new charge. We directed the court to Aubrey. Aubrey, they equipped the people with new phones in order to take advantage of the platform change. We also directed the court to the FCC merger order, and that would be paragraph 214, where the FCC specifically said the combined entity will need to equip the 1,900 megahertz customers with 850 megahertz as well in order to access the additional capacity represented by singular's 850 megahertz GSM network. Now, I don't know if that's what happened, if that's the reason for this degradation of service. But what I do know is that the cost of restoring service should not have been imposed on Mr. Schroer and the other class members here. That is where we – if you're talking about the imposition of extra costs, that's where you go into contract, and that's what's not preempted. We're just trying to enforce a contract. We are not trying to preclude their right to do the merger. We're happy to have them do the merger, Your Honor. We are just trying to enforce our rights under contract. And I understand that there is something under Bastion that makes it look the other way. In Bastion, what he was saying was you shouldn't have been able to do the merger if you didn't have – or you shouldn't have been able to sell your services if you didn't have enough cell towers. We had service the day before. We had enough cell towers the day before, not that we're challenging the number of cell towers. So what they did was we think they used the merger in order to get around the terms of their contracts. We think that that's deceptive. We think that it's a violation of UCL, of the California business and of the California BCL. It's a practice which is unfair. It is a practice which is unlawful. And, by the way, we could also bring a claim under the FCA, Section 201, that the practices are unreasonable. Now, whether or not the facts would bear out that the practice was unreasonable, that is something for discovery. It's not something that can be resolved on a motion to dismiss, and it's not something that we really know why it happened. But we do have contract terms that we've alleged were breached. It's a very simple contract. We do have practices which broadly affect the public that we believe satisfy the requirements for the UCL. We assert a fraud claim. Actually, it gets folded into the UCL claim because the UCL deceptive practices claim does not require actual fraud. But we do have a separate fraud claim. A freestanding fraud claim would be problematic for you. I agree that it's problematic, except in this circumstance, Your Honor. That is, to the extent that Mr. Schroer was specifically told what he had to do to restore his service, without the reasons that he was being told that, in other words, to the extent that they shepherded him into this new contract, that arguably could be fraudulent. The bigger picture allegations, I think, are more problematic, and I agree with you. Just as a final word, you did pick up on the amendment issue, and, yes, we do think we should have the right to amend to state all of these various things that we identified in our complaint. Thank you. Thank you, counsel. Thank you. May it please the Court. Stephen Rice for Defendant and Appellees. This order of dismissal that was issued by the district court can be affirmed on either of two grounds, first the preemption ground and then, second, that the complaint doesn't state facts sufficient to state these claims under state law. With respect to preemption, counsel told the court twice during his argument that they're not attacking the merger order, but that's really what this case is all about. And when you look at the instruction that's given in Bastion, which is you look at the substance of the complaint. Would he have a claim if the merger had resulted in his having no phone service at all? The merger order is some hundred-plus page long. Right. You've got a contract that's only half a page long, maybe. The merger order dictates the way in which the integration is to be accomplished. And if it says, part of the merger is that people who have contracted for phone service in this area aren't going to get any. And we approve that. Does that break any contracts or does that somehow let you out of your contract? No, I think that's a market entry issue. And if the FCC determines that it wants to order such a thing, that that's an issue that a claimant would need to take up with the FCC because the FCC has chosen to exercise its jurisdiction in that manner. 332 states that no state can get involved in market entry or rates. This is a market entry case. How is it a market entry case? This is a market entry and a rate case, Your Honor. It's a market entry case because the merger is how these combined entities are going to enter the market. How are they going to deal with competitive issues? How are they going to deal with system integration and implementation issues? But they're not challenging any of that. They are, Your Honor. Are you saying that the merger order allowed the surviving company to disregard the contract terms? The merger order does not contain words like that, Your Honor. But what we need to do is look at the substance of this complaint. It's couched as a breach of contract case, just like Bastion was. It's couched as a consumer protection case, just like Bastion was. But when you get behind the words, you find a case that challenges market entry and rates just like Bastion. Well, yeah, that's not a Ninth Circuit case. It is not. It's a Seventh Circuit case. But here, look at the words of the complaint, Your Honor. I want to give a few examples. The very first paragraph of this complaint tells the court what this case is about. It's about injuries suffered as a result of degradation of service to AT&T customers after it merged with Singular. No mention of nondisclosures. No mention of terms and conditions. It's about degradation because of the merger. The definition of the class is all customers of AT&T nationwide. Note it's not tied to disclosures or nondisclosures. It's not tied to terms and conditions. It's all customers because their theory is that this merger degraded the service of all customers. The first common issue for the class that's alleged in the complaint is whether defendants have maintained the AT&T network since the merger. And these are just three examples, Your Honor, that I picked out from the way they choose in the introductory allegations of their complaint to characterize their case. And this is what happened in Bastion. And, yes, Your Honors have flexibility to take your own view of these issues. But Bastion's logic is prudent and logical. What they've done here is cast they've learned from Bastion. They've recast their or they've tried in subsequent allegations in the complaint to recast a challenge to the FCC merger order as a consumer protection case. But they really haven't done a very good job of it because even the complaint itself says on its face that they want to challenge the representations that were made to the FCC during the merger process. They want to accuse and litigate that the FCC was misled. They want to go behind that regulatory process. And there are numerous allegations in the complaint that reference the statements that were made to the FCC, the provisions of the merger order. Well, of course, I suppose that you can have a fraud on the regulator case that is still a private fraud case. And you might have to talk about what was said to the regulating agency if it was communicated to you. And here, Judge Canby, there is no allegation that it was communicated to them. They're relying strictly on a fraud on the regulator theory, which has never, insofar as I can determine in my research, and the other briefs in the case don't seem to disclose otherwise, been applied in a situation like this. It's been applied in a securities fraud context, but not in a context like this. What's to keep them from just bringing a straight or even amending to get a straight breach of contract case and just say, all right, our class are people who contracted to get the same service, and they didn't get it for one reason or another during their contract term. They didn't get it. The reason that they can't state a breach of contract claim on these facts, their allegation is that the term of the contract that says service shall be normally available was breached. But the contract also goes on to say that the service is maybe temporarily or interrupted due to system modifications. And that's part of a long paragraph that's at Excerpts of Records 76 to 77 that explains all the various sorts of things, including things like this, that can affect service. So that be a question of whether which contract provision, if any, was breached as opposed to a preemption issue? Yes, Your Honor. And I agree. We believe that Judge Reel was correct both on the preemption issue and on the failure to state a claim under these state law theories. The contract was before the court, as counsel suggested during his argument. There's no dispute about what the contract says. The entire contract is here, and this disclaimer provision is clear and conspicuous. So even if you don't reach the preemption issue or feel differently than Bastion did about the preemption issue, they still can't state a breach of contract claim under these facts. If they were given leave to amend, why couldn't they state a breach of contract claim? Because the entire complaint is in the record. It was proper for the district court to consider. It was proper for Your Honor to consider. But the entire contract is in the record. Correct. The entire contract is in the record. And the relevant provisions are excerpts of records 76 to 77. But the entire contract is right there in the record. They also can't state a fraud or unfair competition claim under any circumstances either. Those two causes of action are based on two problems, a press release and the FCC order. Neither the press release nor the FCC order or the statements made to the FCC were incorrect. The press release, which talks about good news and triple win, those sorts of allegations are not actionable. But in any event, the press release, and, again, it's in the record and there's no dispute about it, it's in excerpts of record 122, specifically contains a disclaimer that statements must be construed in light of possible, quote, service degradation. AT&T and Singular did not hide the ball in connection with this merger, Your Honors. They were fully transparent. The FCC carefully considered this and issued a massive merger order. They were actually objectors in the FCC proceedings raising the issues that the plaintiff is raising here, and those objections are discussed in the merger order. And the FCC said, yes, there may be some implementation problems. There may be some bumps along the road. Service may be degraded as well as delays in improvements. But on balance, this is in the public interest. Service quality and the implementation of the service quality issue was at the heart of the public interest determination that the FCC necessarily had. I said in the merger order, or the FCC discussed that there may be temporary degradations of service. Where is that? Yes, Your Honor. It's at supplemental excerpts of record. There are a number of sites here. I'll give you five or six. Give me the strongest, the one that you think most clearly delineates that point. Well, at 2766, 67 through 69. That's SER 2766? Yes, SER 27, 66, 67 through 69, 198, and 202 to 205. That's a long site. To answer your question specifically, where are the best statements? The best statements are at 67 through 69, which specifically deal with service quality. That's a section that deals only with service quality and discusses some of these issues. If the FCC is saying service quality may be degraded in some areas for a period of time, is it saying that may or may not reach contracts, or is it saying nothing about that? It's saying nothing about the contracts, Your Honor. The merger order in this particular case, unlike the hypothetical you presented earlier, does not address the issue of contractual terms. Well, as a general principle, we know that, or maybe you don't, we don't agree, that contract claims survive the preemption, right? In this particular case, again. Generally. Generally. No, when there's complete preemption, and this is complete preemption. So you argue that there can never be a breach of contract action if the FCC has approved a merger? To be precise, Your Honor, my argument is, and the defendant's argument is, that in a case such as this, and in Bastian, where a breach of contract claim is used to attack market entry and rates, that is completely preemptive. That's not my question to you. My question to you is, is it your argument that if the FCC approves a merger, that that forecloses any breach of contract action against either of the parties to the merger? No, Your Honor, because the FCC, the FCA, excuse me, the Federal Communications Act, specifically carves out, both at the end of 332 and in 414, that there are claims about terms and conditions that survive, and those can be breach of contract claims, and frequently are. Realistically, what would that look like in your theory of the case? There are many examples that are cited in the breach. Things about billing disputes, line entries on bills, charges that appear on bills, and whether there was adequate disclosure, these sorts of things. They're all billing dispute or disclosure cases, not cases that attack an FCC merger order, not cases that deal with market entry and rates, such as this case. I'm looking at the merger order, and I'm trying to figure out what language you're talking about. I'm looking at supplemental excerpts of records starting at page 20, so will you give me the page number at the top that you're talking about? Yes, look at 67 through 68, excuse me, 67 through 69. 67. Okay, improvements in service quality, is that what you're talking about? I'm talking about the section that deals with improvements in service quality. Okay. And if you go on, you'll see, during the course of this section, that there was a company called Thrifty Call that had raised objections about service quality. It disposes of those. Tell me the language that the FCC uses that you say addresses any type of service quality issue. Yes, Your Honor. Paragraph 214 on page 69, the very first sentence, Moreover, we cannot confirm either the magnitude of these benefits or the speed with which they are likely to be achieved. And that's just a summary of a lot of analysis that explains the bumps on the road. Further, if you look down in paragraph 215, they talk about a tradeoff. It says in paragraph 214, as a result, at least in many locations, the improvements may not be immediately achievable. But doesn't that sort of imply that at some point there will be improvements? It does imply that at some point there may be, certainly the expectation would be that there would be improvements. And that's why the FCC came back two years later in the supplemental order, which is also in excerpts of record, and that's why I refer to 202 to 204, which goes back and evaluates the progress of the merger at that point in time and says, yes, there have been troubles with this. Everything that we hoped hasn't been achieved, but it's still in the public interest that this occurred and the continued implementation of it remains in the public interest. So we have two orders, one at the time and one in retrospect, long after Mr. Schroer had terminated his service. He only waited two months after the merger, and he threw up his hands and left. And that was certainly his right to do that. But the point that we're talking about here, Judge Rawlinson, is this notion of the pace and whether the FCC discussed these issues and considered these issues, and the answer to those questions is yes, it absolutely did. So in your view, the remedy available for the plaintiff would be to go to the FCC and complain? How would that work procedurally? I'm not an FCC lawyer, Your Honor, in terms of the regulatory side, so I can't with any confidence tell you exactly procedurally what would have to be done at the administrative level. But what I can say is that 332 specifically says that these types of cases are completely preempted from regulation under state law, and here we have state law. Would there be a private cause of action? I'm not even sure if there would be a private cause of action available to a customer of one of the merging entities. I tend to think not, Your Honor, but, again, I'm treading on thin ice here because these regulatory questions are outside of my expertise. Any other questions for the panel? All right. Thank you, counsel. Thank you. One minute for rebuttal. Very quickly. To refer to Judge Smith's question at the beginning regarding Bastian, Bastian relied on central office, a filed rate case in Fedor, which was a subsequent Seventh Circuit case. They went out of their way to distinguish it in connection with billing practices and rates charged for services. Judge Rawlinson, as you correctly perceived before, a case regarding market entry is different than a case regarding an existing market, and that's what we've got here. We've got an existing market and the failure to comply with the contract. The reason we filed a nationwide class is because they've all got the same contract, and the requirement of a chip to get their service back is inconsistent with the suggestion that this was just temporary. It could have provided everybody with a chip at no cost, and maybe it would have fixed everything, but that's not what we're talking about. With respect to the FCC merger, I looked. I don't see anything that talks about degradation of service. The only thing I see is improvements and delays in improvements, and that's not what we're complaining about. We would have loved to have had improved service afterward, but we would have been happy with the same service we had afterwards. Finally, Judge Rawlinson, in connection with your question about a private right of action, I believe that Federal Communications Act Section 201 gives you a private right of action. I know that CONIF up in Washington has brought FCA 201 claims, and we asked for the leave to amend to specifically bring a 201 cause of action to challenge the unreasonableness of defendants' actions. I should point out that that claim would be decided by a court. It's possible it could be deferred and referred to the FCC, but in any event, it is a private right of action that can be brought in a complaint. Well, in terms of the preemption, I was thinking if the ruling of preemption stands, that would kick you to the FCC, right? Just to point out that in Enri Wireless, the FCC specifically said that a claim for 201 or under 202 is not, first of all, it doesn't impact preemption because those claims are supplemental to the state law claims. I guess if you're asking me to assume if it's preempted, could we go to the FCC? There may be some process. I'm not an expert. I know that there have been FCC claims that have been brought directly with the FCC, but again, we don't think this is preempted, and I'm not trying to dance around Bastion. If you look at our briefs on pages 11 through 14 of our reply brief and the original footnote, Bastion was decided before Enri Wireless. It was decided under the filed rate doctrine, which Enri Wireless says is inapplicable, and it's a case that's readily distinguishable aside from the fact that it doesn't buy in the Ninth Circuit. Interesting case. Thank you to both counsel for your arguments. The case just argued is submitted for decision by court. The final case on calendar for argument this afternoon is Antelope Valley Healthcare District v. Citadel Properties, Lancaster.
judges: Canby, Rawlinson, Smith N. R.